UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------x
CAROLYN L. COPELAND,

                Plaintiff,

      -against-

COMMISSIONER OF SOCIAL SECURITY,

                Defendant.
------------------------------------------------------x

**MEMORANDUM AND ORDER**
Case No. 05-CV-3684 (FB)

*Appearances:*
*For the Plaintiff:*
CAROLYN L. COPELAND, *pro se*
2940 West 31st Street, Apt. 7G
Brooklyn, New York 11224

*For the Defendant:*
ROSLYNN R. MAUSKOPF, ESQ.
United States Attorney
Eastern District of New York
By: ZACHARY A. CUNHA, ESQ.
Assistant United States Attorney
147 Pierrepont Street
Brooklyn, New York 11201

**BLOCK, Senior District Judge:**

        Plaintiff, Carolyn L. Copeland, ("Copeland"), proceeding *pro se*, seeks review of the final decision of the Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income ("SSI"). The Commissioner moves for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). Because the administrative law judge ("ALJ") failed, in many respects, to apply the correct legal standards and to base his decision on substantial evidence, the case is remanded for further proceedings.

I.

The following facts are taken from the Administrative Record ("A.R."):

On October 9, 2001, Copeland filed an application for SSI alleging that since February 1998, she has suffered from epilepsy and severe back and neck injuries. On March 22, 2002, the Commissioner denied Copeland's application, noting that medical treatment had stabilized her condition and finding that "your condition is not severe enough to keep you from performing [medium] work." A.R. at 57. On April 8, 2002, Copeland asked for a hearing with an ALJ, which took place on March 30, 2004. When it was discovered that the assigned ALJ had denied a previous application for benefits by Copeland, the case was reassigned and the hearing continued to July 29, 2004.

The medical evidence presented at the July 29th hearing included outpatient and inpatient records from Coney Island Hospital, where Copeland had been treated by multiple physicians and diagnosed with grand mal seizure disorder. Copeland's treating physicians also traced her complaints of back pain to mild degenerative disease of the cervical spine, and further diagnosed chronic ischemic heart disease (lack of oxygen to the heart) resulting in chest pain. One treating internist further opined that she "cannot do any kind of job." A.R. at 426. A state-agency consulting physician, Dr. Thomas Silverberg ("Silverberg"), confirmed the diagnosis of grand mal seizure disorder and mild degenerative disease of the cervical spine; he also opined that Copeland should be restricted from working at high or isolated locations.

The medical record reflects that Copeland tested below the therapeutic level of Dilantin, her prescribed anti-seizure medication, on nine out of twelve blood tests

2

conducted from January 1997 to March 2004. Several treating physicians inferred from these blood tests that Copeland was frequently not taking her medication as instructed.

With regard to non-medical evidence, the ALJ took testimony from Copeland, who appeared *pro se* at the July 29th hearing. She testified that she suffered from violent seizures five to six times per month, and that "they" would not let her work due to her seizure disorder; the record is unclear as to whether "they" refers to Copeland's children or her potential employers.

In addition to Copeland's testimony, the non-medical record includes a form "Residual Functional Capacity Assessment" completed by one F. Rivera ("Rivera"). Identified in the record as a "disability examiner" (a state employee tasked with determining the medical eligibility of SSI claimants), Rivera crossed out "medical consultant" on the assessment form; the record does not otherwise reflect Rivera's credentials.

Rivera opined that despite seizures and high blood-pressure, Copeland could lift 50 pounds occasionally, 25 pounds frequently, stand and/or walk about 6 hours in an 8-hour workday, and push or pull with no limitations. Rivera further opined that despite her impairments, Copeland could work as an odd-piece checker, a sandwich-board carrier, or a cashier; the sole stated basis for this opinion was a citation to the Department of Labor's *Dictionary of Occupational Titles* ("DOT").

In a written decision dated December 8, 2004, the ALJ evaluated the foregoing evidence to determine whether Copeland was disabled. First, he found that Copeland had not engaged in substantial gainful activity since first applying for SSI.

3

Second, the ALJ found that "the claimant's asthma and chest pain cause significant vocationally relevant limitations and are, therefore severe." A.R. at 13. Elsewhere in the decision, however, he stated that "the only impairment that the claimant has that substantially diminishes her ability to work is her seizure disorder." *Id.* at 16. At no point did he address the nature or severity of Copeland's other diagnosed impairment, i.e., mild degenerative disease of the cervical spine.

Third, the ALJ found that Copeland's seizure disorder was not a *per se* disability under the Commissioner's Listing of Impairments, 20 C.F.R. pt. 404, subpt. P, app. I, because Copeland had chronically failed to take her medication as instructed. He did not expressly address whether any of Copeland's other impairments satisfied the criteria for a *per se* disability; rather, he simply concluded, without further elaboration, that "she has no impairment or combination of impairments that meets in severity the criteria [for a *per se* disability]." A.R. at 17.

Fourth, the ALJ found that although Copeland had no past work experience, she could "lift and/or carry up to ten pounds frequently and 20 pounds on occasion," A.R. at 15; he also found that Copeland's seizure disorder imposed additional, non-exertional limitations in that she could not "work near heights or machinery, or drive or work in isolated locations." *Id.* at 15-16. In reaching his conclusions regarding Copeland's abilities, the ALJ rejected the opinion of her treating internist that she could not work at all.

Fifth, the ALJ found that, considering Copeland's "vocational profile and residual functional capacity within the framework of [the Commissioner's Medical-Vocational Guidelines,] a finding of not disabled within the meaning of the Social Security

4

Act is appropriate." A.R. at 17. He then added that, "[e]ven with her limitations, Ms. Copeland would nevertheless be able to satisfy the demands of an odd piece checker, a sandwich board carrier or a cashier as described in *The Dictionary of Occupational Titles*[.]" *Id.*

Based on the foregoing findings, the ALJ concluded that Copeland was not disabled and, therefore, not eligible for SSI.

On February 11, 2005, Copeland sought review of the ALJ's decision with the Commissioner's Appeals Council. On June 25, 2005, the Appeals Council denied the request for review, thereby rendering final the Commissioner's decision to deny benefits.

II.

A. Standard of Review

"In reviewing the final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision." *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004). The former determination requires the Court to ask, *inter alia*, whether "the claimant has had a full hearing under the [Commissioner's] regulations and in accordance with the beneficent purposes of the Act." *Echevarria v. Secretary of Health & Human Servs.*, 685 F.2d 751, 755 (2d. Cir 1982) (citation and internal quotation marks omitted). The latter determination requires the Court to ask whether the decision is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). In that regard, ALJs must ensure that the crucial factors in their

5

determinations are "set forth with sufficient specificity to enable [a court] to decide whether the determination is supported by substantial evidence." *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).

## B. General Legal Standards for Disability Claims

To qualify for SSI, a claimant must be disabled, that is, "[unable] to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A). Under the Commissioner's regulations, an ALJ must determine whether a claimant is disabled in accordance with a well-established five-step process:

> At the first step, the agency will find non-disability unless the claimant shows that she is not working at a "substantial gainful activity"....
>
> At step two, the SSA will find non-disability unless the claimant shows that she has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities"....
>
> At step three, the agency determines whether the impairment which enabled claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies....
>
> If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled....
>
> If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and

> to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy.

*Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003) (citing 20 C.F.R. § 416.920(b-f) (now 20 C.F.R. § 416.920(a)(4)(i-v))); *see also Jasinski v. Barnhart*, 341 F.3d 182, 183-184 (2d Cir. 2003). The burden of persuasion rests on the claimant at steps one though four; it shifts to the Commissioner at step five. *See Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996) ("If the claimant satisfies her burden of proving the requirements in the first four steps, the burden then shifts to the [Commissioner] to prove in the fifth step that the claimant is capable of working.").

## III.

Copeland's form complaint seeking review of the Commissioner's decision alleges only that the ALJ's decision was "erroneous" and "contrary to the law." Compl. ¶¶ 10-11. As she does not specify the grounds on which her claims of error are based, the Court will review each of the five steps that led to the ALJ's conclusion that she was not disabled.

### A. Step One

The ALJ's finding that Copeland had never engaged in substantial gainful activity is not a ground for remand because it was resolved in Copeland's favor. In any event, the finding was supported by substantial evidence: Copeland testified, and the record corroborated, that she has never worked.

### B. Step Two

At step two, the ALJ concluded that Copeland's "asthma and chest pain"

7

were severe impairments. A.R. at 13. This finding was technically beneficial to Copeland because it precluded the ALJ from denying benefits on the ground that Copeland did not have any severe impairments. It is nevertheless deficient because it does not set forth a complete, consistent list of Copeland's impairments.

In the first place, none of Copeland's treating physicians diagnosed asthma, and none of the other medical evidence suggests that she has that impairment. Second, inasmuch as a "severe" impairment is defined as one which "significantly limits [the claimant's] physical or mental ability to do basic work activities," 20 C.F.R. § 416.921(a), the ALJ's list of Copeland's severe impairments at step two is inconsistent with his later conclusion that her seizure disorder was "the only impairment that the claimant has that substantially diminishes her ability to work." A.R. at 16.

Third – and perhaps most significantly – the ALJ ignored Copeland's other diagnosed impairment: mild degenerative disease of the cervical spine. Under the well-established "treating-physician rule," "'a treating source's opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s)' will be given 'controlling weight' if the opinion is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record.'" *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003 (quoting 20 C.F.R. § 404.1527(d)(2)). Even when the rule does not require giving a treating physician's opinion controlling weight, the ALJ must nevertheless evaluate the opinion in accordance with specified criteria and "give good reasons in [the] notice of determination or decision for the weight [to be given to the] treating source's opinion." *Halloran v. Barnhart*, 362 F.3d

8

28, 32 (2d Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2)). By failing to address one of the impairments diagnosed by Copeland's treating physicians, the ALJ violated these rules.

Moreover, a proper determination of the claimant's impairments at step two is the foundation from which all remaining steps proceed. *See* 20 C.F.R. § 416.920(a)(4)(iii) ("At the third step, we also consider the medical severity of your impairment(s)."); *id.* § 416.945(a)(2) ("We will consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not "severe," ... when we assess your residual functional capacity [to be applied at steps 4 and 5]."). Without a complete and consistent list of Copeland's impairments, the Court simply cannot determine whether the ALJ's ultimate decision that Copeland is not disabled was supported by substantial evidence.

## C. Step Three

At step three, the ALJ correctly noted that epilepsy qualifies as a *per se* disability only if it persists "in spite of at least 3 months of prescribed treatment." 20 C.F.R. pt. 404, subpt. P, app. 1, §§ 11.02-11.03; his finding that Copeland had consistently failed to comply with her prescribed treatment was amply supported by the record.

As at step two, however, the ALJ's analysis at step three was incomplete. There is no determination as to whether any of Copeland's other impairments satisfied the criteria for a *per se* disability; nor is there any determination as to whether the total effect of all her impairments was equivalent to a *per se* disability. *See* 20 C.F.R. § 416.926(b)(3) ("If you have a combination of impairments, no one of which meets a listing described in the Listing of Impairments, ... we will compare your findings with those for closely analogous

9

listed impairments. If the findings related to your impairments are at least of equal medical significance to those of a listed impairment, we will find that your combination of impairments is medically equivalent to that listing.").

## D. Step Four

At step 4, the ALJ found that Copeland could "lift and/or carry up to ten pounds frequently and 20 pounds on occasion," A.R. at 15, in other words, that she had a residual functional capacity (or "RFC") for "light work." *See* 20 C.F.R. § 416.967(b) ("Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."). The ALJ also found that she could not "work near heights or machinery, or drive or work in isolated locations." A.R. at 15-16.[1] This latter finding regarding Copeland's non-exertional limitations is supported by substantial evidence, namely, Silverberg's consultative opinion; the ALJ was entitled to credit this opinion over Copeland's treating internist's opinion that she could not "do any kind of job." A.R. at 426. *See* 20 C.F.R. § 416.927(e)(1) ("A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that [the Commissioner] will determine that your are disabled."); *Gagnon v. Barnhart*, 210 F. Supp. 2d 111, 121 (D. Conn. 2002) ("[T]he Commissioner will not give enhanced weight to a treating physician's opinion as to the claimant's RFC.").

However, unlike the determination regarding her non-exertional limitations,

---

[1]In the usual case, the ALJ uses the claimant's exertional and non-exertional limitations at step four to determine whether the claimant can still do her previous work. *See* 20 C.F.R. § 416.920(a)(4)(iv). As Copeland has no previous work experience, such a determination was unnecessary here.

10

the ALJ's determination that Copeland had no exertional limitations preventing her from doing light work was not supported by substantial evidence. Silverberg's report, while listing Copeland's non-exertional limitations, simply does not address what exertional limitations, if any, her impairments impose.

The only document in the record addressing Copeland's exertional limitations is Rivera's "Residual Functional Capacity Assessment." Reliance on this document is problematic for two reasons.

First, while the Commissioner allows disability examiners like Rivera to "assist in completion of the RFC assessment forms," a medical (or psychological) consultant must sign the form "to attest that he/she is responsible for its content, including the findings of fact and discussion of supporting evidence." Social Security Administration, *Programs Operations Manual System* ("POMS") § DI 24510.005, ¶ B.2.b. The record does not reflect that Rivera qualified as a medical consultant; indeed, that Rivera felt it necessary to cross out that representation on the assessment form affirmatively suggests that he (or she) did not.

Moreover, Rivera's assessment was expressly based on Copeland's "seizures" and "hypertension," A.R. at 161; it makes no mention of her ischemia or the degenerative disease of her cervical spine. Once again, the lack of a complete, authoritative list of Copeland's impairments calls the ALJ's determinations into question.

### E. Step Five

At step five, the ALJ concluded that considering only Copeland's exertional limitations, the Commissioner's Medical Vocational Guidelines directed a finding of not

11

disabled. He then concluded that even when her non-exertional limitations were taken into account, "Ms. Copeland would nevertheless be able to satisfy the demands of an odd piece checker, a sandwich board carrier or a cashier as described in *The Dictionary of Occupational Titles*[.]" A.R. at 17.

"In the ordinary case, the Commissioner meets [her] burden at the fifth step by resorting to the applicable medical vocational guidelines,"*Rosa v. Callahan*, 168 F.3d 72, 78 (2d Cir. 1999) (citation and internal quotation marks omitted); those guidelines, colloquially known as "the Grids," take into account "the claimant's residual functional capacity in conjunction with the claimant's age, education, and skill level." *Id.* (citation and internal quotation marks omitted). If, however, a claimant has non-exertional limitations (which are not accounted for in the Grids) that "'significantly limit the range of work permitted by his exertional limitations' then the [G]rids obviously will not accurately determine disability status," *Bapp v. Bowen*, 802 F.2d 601, 605 (2d Cir. 1986) (quoting *Blacknall v. Heckler*, 721 F.2d 1179, 1181 (9th Cir. 1983)); in such cases, "the Commissioner must 'introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the national economy which claimant can obtain and perform." *Rosa*, 168 F.3d at 78 (quoting *Bapp*, 802 F.2d at 603).

A "significant" non-exertional limitation is one that results in "the additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity." *Bapp*, 802 F.2d at 606. To assist ALJs in deciding whether a particular non-exertional limitation or set of limitations is significant, the Commissioner has promulgated

the following policy statement:

> In reaching judgments as to the sufficiency of the remaining exertional job base (approximately 2,500 unskilled medium, light, and sedentary occupations, approximately 1,600 unskilled light and sedentary occupations, and approximately 200 unskilled sedentary occupations), there are three possible situations to consider:
>
> 1. Where it is clear that the additional limitation or restriction has very little effect on the exertional occupational base, the conclusion directed by the appropriate rule in [the Grids] would not be affected.
>
> 2. Where it is clear that additional limitations or restrictions have significantly eroded the exertional job base set by the exertional limitations alone, the remaining portion of the job base will guide the decision.
>
> 3. Where the adjudicator does not have a clear understanding of the effects of additional limitations on the job base, the services of a VS [vocational specialist] will be necessary.

SSR 83-14, 1983 WL 31254, at *6 (SSA).[2]

Here, as the ALJ recognized, Copeland's seizure disorder imposes non-exertional limitations; the ALJ was therefore obliged to determine (based on substantial evidence) whether those limitations significantly reduced the number of jobs she could do. If they did not, then the ALJ should have relied solely on the Grids; if they did, then evidence regarding the jobs Copeland could do despite *all* her limitations (either from a vocational expert or some other source) would have been necessary. Any doubt about the significance of the non-exertional limitations should have been resolved by enlisting the

---

[2]An analogous policy statement applies to cases in which the claimant has *only* non-exertional limitations. *See* SSR 85-15, 1985 WL 56857 (SSA)

13

services of a vocational expert.

The ALJ did not squarely decide whether Copeland's non-exertional limitations were "significant," and did not clearly treat the case as either a Grids or a non-Grids case; this lack of clarity precludes the Court from conducting meaningful review of the ALJ's decision at step five.

Moreover, there is no substantial evidence regarding the significance of Copeland's non-exertional limitations. While Rivera opined that Copeland could perform the functions of of an odd-piece checker, a sandwich-board carrier, or a cashier, there is no evidence that Rivera was qualified to offer such an opinion. *See Laird v. Stilwill*, 969 F. Supp. 1167, 1190 n.17 (N.D. Iowa 1997) (reciting qualifications for vocational expert as listed in POMS).

Furthermore, both Rivera and the ALJ relied solely on the DOT as the basis for their conclusion that Copeland could still perform certain jobs in the national economy. While the job listings in the DOT include brief job descriptions and vocational requirements (such as math skills, language skills, reading level, and strength demands), they do not take into account any non-exertional limitations. *See Gravel v. Barnhart*, 360 F.Supp.2d 442, 451 (N.D.N.Y. 2005) (noting that "the DOT definitions . . . do not contain information about the specific limitations identified by the ALJ"); thus, mere citations to the DOT do not constitute substantial evidence of the jobs a claimant can do despite non-exertional limitations. *See id.* ("Because there is no testimony from the VE [vocational expert] regarding the jobs' occupational requirements, the conclusory reference to the DOT's light exertional level is inconsistent with Gravel's RFC. Therefore, the jobs cited by the VE do

not constitute substantial evidence in support of the ALJ's determination.").[3]

In sum, to justify the ALJ's finding at step five, there must be substantial evidence either (1) that Copeland's non-exertional limitations were insignificant (in which case the Grids would apply); or (2) that the limitations were significant, but that Copeland could nevertheless still perform jobs that exist in the national economy. There is neither.

IV.

For the foregoing reasons, the case is remanded for further proceedings in accordance with this Memorandum and Order. On remand, the ALJ must develop a complete list of Copeland's medically determinable impairments, and must determine

---

[3]A more appropriate – and, happily, more typical – means of addressing step five in a case involving non-exertional limitations is set forth in *Kennedy v. Apfel*, 1999 WL 684155 (E.D.N.Y.) (Jul. 8, 1999):

> The ALJ posed hypotheticals to Ms. Jonas [a vocational expert] that included the information of plaintiff's age, education and vocational profile. In addition, the ALJ asked Ms. Jonas to consider an individual who had no restriction sitting, a limited ability to walk . . . and an ability to stand most of the day . . . , and an ability to lift between fifteen and twenty pounds for short distances. In the hypothetical, the ALJ also included that the individual had environmental restrictions, specifically, the need to avoid exposure to dust, fumes and gases . . . . Ms. Jonas stated that plaintiff could work as a cashier, ticket taker and mail clerk in an office building. . . . She also testified that plaintiff could perform certain assembly jobs. [She also testified that all] of the jobs existed in significant numbers in the national economy.

*Id.* at *7. Assuming the facts underlying the hypotheticals are supported by substantial evidence, addressing step five in this manner "provide[s] ample evidence that despite plaintiff's nonexertional limitations, there were still a significant number of jobs that [the plaintiff] was capable of performing." *Id.* (citing *Dumas v. Schweiker*, 712 F.2d 1545 (2d Cir. 1983)).

whether those impairments, considered individually as well as collectively, satisfy the criteria for a *per se* disability. The ALJ must also insure that all of Copeland's impairments are taken into account in determining her exertional and non-exertional limitations. Finally, the ALJ must determine (based, if necessary, on testimony from a vocational expert or other similar evidence) whether, despite all limitations, Copeland can still perform work existing in the national economy.

**SO ORDERED.**

FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
July 27, 2006